**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**UNITED STATES OF AMERICA,**

**Case No. 4:06cr21-RH**

**vs.**                                                              **Case No. 4:08cv211-RH/WCS**

**GANGSTA' KO-LOFF
BISHOP GOSPIDON,
a.k.a. DERRICK JOHNSON,**

      **Defendant.**

_____/

**REPORT AND RECOMMENDATION TO DENY § 2255 MOTION**

Defendant Gospidon, proceeding pro se, filed an amended motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 with supporting memorandum. Doc. 103. Defendant also supplied a "point for point sworn affidavit" and exhibits. Doc. 103-2. The Government filed a response in opposition. Doc. 105. Defendant filed a traverse. Doc. 108.

**Procedural Facts**

Defendant was charged with conspiracy to distribute and possess with intent to distribute crack cocaine, distribution and possession of crack cocaine, possession of a firearm, a Ruger 9 millimeter pistol, in furtherance of the crack cocaine offenses, and

possession of the same firearm as a convicted felon, a total of five counts. He was found guilty by a jury and was sentenced to a combined term of 37 years imprisonment. The judgment was affirmed on appeal. Doc. 98.

The evidence and argument made prior to, during, and after trial is set forth here in some detail as relevant to these § 2255 claims. A motion hearing was held on July 25, 2006. Doc. 85 (transcript). The court asked Defendant to explain his dissatisfaction with counsel. *Id.*, p. 2. Defendant said he asked counsel to file a motion to suppress, and counsel said he had no grounds and thought Defendant should enter a plea. *Id.*, p. 3. Counsel was asked to tell the court "what, if any, seizure of evidence there was and what the analysis is there." *Id.*, p. 7.

Counsel explained that law enforcement executed a search on an apartment on August 19, 2005, and seized cocaine and a gun. *Id.* Counsel said the warrant was signed and executed the same morning, but Defendant "doesn't believe that the judge signed the search warrant. It was Judge Parsons." *Id.* Counsel said that he had gone over the law on warrants with Defendant, and did not believe there existed any grounds for a challenge. *Id.*, pp. 7-8.

Defendant explained to the court that there was an application for a no-knock warrant, but the warrant counsel "went and got from the clerk office, well, it was a regular search warrant, and the no knock clause was snatched out of it, and it had two different dates on it." *Id.*, p. 8. Defendant said that his attorney, William Clark, told him that Armando Garcia, Defendant's lawyer in state court, advised that Judge Parsons signed the warrant; but Defendant thought the two signatures on the document looked similar "and one was snatched out." *Id.* He thought the date of the application should

have been before the date of the warrant. *Id.*, p. 8. He said the warrant Mr. Clark gave him did not have a filing date on it, but the regular warrant (not a no-knock warrant) had the dates changed. *Id.*, pp. 8-9. Counsel explained that Defendant was using the term "search warrant" to also refer to the affidavit, and it looked like the judge signed the search warrant on the same day that the application and affidavit were submitted. *Id.*, p. 9.

The court told Defendant that the Supreme Court had recently decided that violation of the knock and announce rule did not justify suppression of evidence. *Id.*, pp. 10-11, 15. *See* Hudson v. Michigan, 547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006). Counsel said that the warrant appeared to be issued after it was applied for, and he thought the later date Defendant was referring to was when the return was stamped as having been received. Doc. 85, p. 11.

While it might look to Defendant like something was amiss about the dates, counsel understood what Clark was saying and advised Defendant that it made sense. *Id.*, pp. 11-12. Defendant told the court he thought that both signatures (of the applicant for the warrant and Judge Parsons) were the same writing, and the date for each was written the same way. *Id.*, pp. 12-13. The court thought that "whoever it was on the affidavit, and the signature of the judge on the search warrant don't look the same to me." *Id.*, p. 13. He said each was an illegible scrawl but they did not "look at all the same to me." *Id.*, p. 14. The writing for the dates did appear similar, but the court noted it would be normal for the officer to fill out everything including the dates, so the judge only had to sign it. *Id.* The court found nothing to suggest that Clark had not been effective. *Id.*, pp. 11, 15-16.

The first trial resulted in a mistrial. Doc. 86 (transcript of July 27, 2006). During cross examination of Rowan, defense counsel asked if the warrant that had actually issued – as opposed to the affidavit or application for warrant – identified it as a no-knock warrant. Doc. 86, pp. 116-119. Rowan said that, while it was not specified in the warrant itself, the judge talked to him about the no-knock issue and it was intended as such a warrant by himself and the judge. *Id.*, pp. 118-119. When asked about the nature of a no-knock warrant, Rowan said it gave them more authority, and explained that the application "specifically states the reason we wanted a no-knock search warrant in this particular case, and we clearly stated it, because of the defendant's violent past, the fact that there are firearms." *Id.* At this point, the lawyers were called to the bench. *Id.*, p. 119. Defense counsel sought and was granted a mistrial based on the reference to Defendant's "violent past." *Id.*, pp. 119-137.[1]

The first day of the second trial was August 1, 2006. Doc. 88 (transcript). Defense counsel told the jury in opening argument that they would see a video, and asked them to pay close attention, as Defendant contended it was someone else (other than himself) in the video. *Id.*, pp. 35-38.

Natasha Moody testified that she lived in a Parkview Gardens apartment, and in April of 2005 she met Defendant and he moved in shortly thereafter. *Id.*, pp. 40-41.

---

[1] The prosecution noted that they called Rowan in part in response to the cross examination of Lieutenant Corder, to clear up a possible suppression issue if raised during trial, or later as an ineffective assistance of counsel claim. *Id.*, pp. 128-129. He wanted clarification about the appropriateness of the warrant, including who signed the application and how it was submitted by the officer who prepared it and took it to the judge. *Id.* In granting a mistrial, the court noted that the Supreme Court had unequivocally held that violation of the no-knock rule would not justify suppression of the evidence, so there was no basis for the Government's concern that that would be an issue. *Id.*, p. 136.

She said that Defendant was not really her boyfriend, but slept with her when he was there. *Id.*, p. 42. She saw him in possession of crack and powder cocaine, and saw him sell crack cocaine, maybe a month after he moved in. *Id.*, pp. 42-43. He sold the crack out of her apartment, and would carry it around in a pill bottle. *Id.*, p. 43. Other people who visited her apartment at that time included Sammy McCray ("Shankey"), Kelvin Robinson ("Cool Bird"), Ronnie Johnson ("Biscuit"), and Anisha Williams, the girlfriend of McCray. *Id.*, pp. 43-45.[2] Moody saw Defendant in possession of a gun, and identified the firearm in evidence as the one Defendant carried with him, in the waistband of his pants. 45-46. She saw him selling crack when he had the firearm with him. *Id.*, p. 47.

Moody identified the layout of her apartment. *Id.*, pp. 47-49. She said that when the search was executed on August 19, 2005, she was in the living room watching television with Ronnie Johnson. *Id.*, p. 49. She said that Defendant was in the kitchen at the table "getting high." *Id.*, pp. 50. When the officers knocked, she, Johnson, and Defendant ran towards the back door where officers took them into custody. *Id.*, pp. 50-51. She identified the kitchen table and Defendant's things that were on the table. *Id.*, pp. 51-53.

Moody said that at around 4:30 p.m. on the day before the search, she and Defendant were in bed sleeping. *Id.*, p. 55. A man came in to talk to Defendant. *Id.* Defendant left the room. *Id.*

---

[2] Hereafter, references to these individuals are to their surname even where the witness used the first name or nickname.

The video tape was played. *Id.*, p. 56. Moody identified Robinson as the person who opened the door, and the inside of her room where she was sleeping with Defendant, and identified Defendant as the person wearing a stocking cap, which he wore when sleeping. *Id.*, pp. 56-57. On cross examination, she said she did not know the man who came into the room, but identified Defendant as the person in the stocking cap; she said he did not have a beard then and did not look much different than he did now, but maybe was a little heavier. *Id.*, pp. 58-59. On redirect she said that on the day of the search, Defendant had a goatee. *Id.*, pp. 66.

Anisha Williams testified and identified Defendant in the courtroom. 66-67. She was at the apartment that morning, not during the search but before it. 67. She had met Defendant in April of 2005. *Id.*, pp. 68. She saw McCray and Defendant sell crack cocaine out of the apartment more than once, and they carried their crack in pill bottles. *Id.*, p. 69. She never saw Robinson sell crack. *Id.* She said she never saw Defendant or McCray or Johnson with the gun, and the gun did not belong to Moody or to her. *Id.*, p. 71. On cross, she said she had never seen that gun before, had never seen Defendant with a gun, and had never seen a gun in that apartment. *Id.*, pp. 72-76.

Ronnie Johnson testified and identified Defendant in the courtroom. *Id.*, pp. 80-81. Johnson was age 19 at the time of trial, and testified that he had known the Defendant since he (Johnson) was 8 or 9, and at one time Defendant was sort of a role model for him. *Id.*, pp. 96-97. Johnson said that during the period when the search was conducted, he was at Moody's apartment every other day; when he was there, Defendant was there, as well as McCray and Robinson. *Id.*, pp. 81-82. He saw Defendant and McCray sell crack from the apartment but did not see "Cool Bird" sell it.

*Id.*, pp. 82.  He said Defendant would sell crack to Charleston Jerome Bullock from the apartment.  *Id.*, pp. 83.

Johnson admitted that he testified under oath before the grand jury that he had never seen Defendant with a black semiautomatic type of gun, that he had only seen him with a revolver.  *Id.*, pp. 86-87.  He identified the firearm which had been introduced in evidence and said that he saw Defendant carry it with him, in his waistband, and he had been scared to say this before.  *Id.*, pp. 87-88.  He did not tell anyone about this until earlier, the day of trial.  *Id.*, p. 88.  His testimony at trial was that he never saw Defendant with a revolver, and was not being truthful before.  *Id.*, p. 89.  On cross examination, he repeated that he previously said he saw Defendant with a .38 revolver that was a toy and never saw him with a 9 millimeter pistol, and that was the story he had told to the grand jury and afterwards, until the trial.  *Id.*, pp. 90-91.  On redirect, Johnson said he had not been promised anything or threatened, that he had been told to contact the agent if something came up, so he contacted him.  *Id.*, pp. 96-97.

Freddie Turner testified that he smoked crack at the Parkview Apartments.  *Id.*, pp. 103.  He identified Defendant in the courtroom, and said that late one night, actually 1:00 or 2:00 in the morning, in August of 2005 he went into Moody's apartment, and Defendant offered him some crack.  *Id.*, pp. 104-105.  He said Defendant put some crack in his hand but Turner gave it back, as it was to be in exchange for a car and Turner did not believe it was enough for the trade.  *Id.*, pp. 105-107.  Turner identified the gun in evidence, and said Defendant put the gun to his head and he dropped the car keys.  *Id.*, p. 107.  Defendant gave him some crack, which Turner smoked with some other people there, and Defendant drove off in the car a little while later.  *Id.*, pp. 108-

109. Turner reported the car stolen the next day (actually later the next day), but did not recall mentioning that the theft occurred during a crack transaction. *Id.*, pp. 109-110.

Lieutenant Jim Corder, with the Gadsden County Sheriff's Office, testified. At the time of trial he had been with the drug unit for some 17 years and prior to that had been with the Quincy Police Department for 14 years. *Id.*, pp. 117-118. He described the difference between crack and powder cocaine, and how crack was sold in pieces known as rocks and cookies for street dealing. *Id.*, pp. 119-120. He said it was commonly carried in pill bottles. *Id.*, p. 120. He explained what a controlled purchase is, and how recording devices are used, and that the recordings are not of high quality. *Id.*, pp. 121-123. He discussed the investigation of Moody's apartment, and controlled crack cocaine purchases made by Charleston Jerome Bullock on August 17 and 18, 2005. *Id.*, pp. 123-129. He identified DVDs of the transactions of August 17 and 18, 2005, and the crack cocaine purchased on those dates. *Id.*, pp. 128-130.

Corder testified that a search warrant was obtained, and served around 10:00 a.m. on August 19, 2005. *Id.*, p. 131. He said there was a search team at the front door and back door of the apartment, and they knocked several times and got no response before using a sledgehammer to gain entry. *Id.*, pp. 132, 140.[3] He described who was in the apartment and what was found once they entered the apartment. *Id.*, pp. 140-157. He identified Defendant in the courtroom. *Id.*, pp. 141-142.

On cross examination, Corder said that on the day of the search, Defendant had a goatee, not a full beard. *Id.*, pp. 158-159. He said that they did not find Defendant's

---

[3] Direct examination of Corder was interrupted to allow the testimony of Charlotte Finch.

fingerprints on the 9 millimeter pistol or on the bullets, but found a latent print on one of the 9 millimeter sleeves. *Id.*, p. 162. He said it was a fairly common practice in Gadsden County for people without money to rent out their cars in exchange for crack cocaine. *Id.*, pp. 162-163. .

Charlotte Finch testified that she had been with the Quincey Police Department since January, 2002. *Id.*, p. 133. Prior to that she had been with the Gadsden County Sheriff's office for 12 to 15 years. *Id.* She testified that she took the stolen vehicle report from Freddie Turner on August 17, 2005, and said she located the car on the same day. *Id.*, pp. 133-135. She made eye contact with the driver, determined the tag number was correct, and activated the blue lights on her vehicle. *Id.*, pp. 135-136. The car drove off into Parkview Garden Apartments, and driver jumped out and fled. *Id.*, p. 136. She identified Defendant as the driver. *Id.* When Finch spoke to Defendant the next day about the vehicle, he told her that he had purchased it from Turner for $20. *Id.*, pp. 136-137.

Charleston Bullock testified that he worked as a confidential informan and had been addicted to crack cocaine. *Id.*, pp. 164-165. He said that Defendant, who he identified in the courtroom, sold crack to him from Moody's apartment seven times or more in June, July, and August of 2005. *Id.*, pp. 165-166. When Bullock bought crack he said Defendant had the 9 millimeter gun, like the one in evidence, either on the table (inside the apartment) or in his belt (when outside). *Id.*, pp. 167, 168. Bullock said he bought crack numerous times from Robinson and McCray, but he never saw them with that gun. *Id.*, p. 168. He testified about making the controlled purchases on August 17 and 18, 2005, and identified Defendant in the video. *Id.*, pp. 169-176.

On cross examination, Defendant's attorney brought out that Bullock was sometimes paid, and had been an informant for 15 or 20 years. *Id.*, p. 178. Counsel asked about people in the video. Bullock said he did not remember if Defendant had a beard then or if the person in the video whom he identified as Defendant had a beard, but admitted Defendant did not have one now. *Id.*, pp. 180-181.

ATF Agent William Visnovske testified that he was contacted by the Gadsden County Sheriff's Office and the Quincy Police Department about this case. *Id.*, pp. 216-217. He read the stipulation by the parties that Defendant had previously been convicted of a felony, that his right to own or possess a firearm had not been restored, and that the firearm introduced in this case had been transported in interstate commerce. *Id.*, pp. 217-218. He discussed the Ruger 9 millimeter, introduced by the Government, and said the ammunition had traveled in interstate commerce. *Id.*, pp. 218-220.

Visnovske said he interviewed Johnson on February 1, 2005, when he served Johnson with the grand jury subpoena. *Id.*, p. 221. Johnson said at that time he had not seen Defendant with the Ruger, which he asserted was the truth and he said that he (Johnson) would stick to that story. *Id.*, pp. 221-222. The next time Visnovske talked to Johnson was the day before trial, *Id.* He told Johnson that if something changed or he had a change of heart to call Visnovske. *Id.* Johnson did so the morning of trial, and told Visnovske he had seen Defendant several times with the 9 millimeter. *Id.*, pp. 222-223. Johnson was emotional when he told him this. *Id.*

On cross examination, defense counsel pointed out that "this morning . . . not only does he have a story that is different than what you understood him to tell Gadsden

County a year ago, but it's perjury compared to what he said to the federal grand jury in February?", to which Visnovske answered, "[t]hat's correct." *Id.*, p. 225. On redirect he said he was not surprised that Johnson changed his story, because the first time they talked Johnson was "a young kid just really confused. I don't think he really knew what was before him." *Id.*, p. 226. "And yesterday he was emotional. I don't think it would have taken too much for him to start crying. He was scared." *Id.* Visnovske said he explained to Johnson he needed to tell the truth and not perjure himself. *Id.*

The next day the Government rested. Doc 89, p. 251 (transcript of second day of trial). Defendant confirmed to the court that it was his decision not to testify. *Id.*

Defendant called William Smith as a witness. *Id.*, p. 252. Williams said he had met Ronnie Johnson over the past few days because they were cellmates, they talked about this case, and Johnson told Williams he knew that his fingerprints and Defendant's were not on the gun, that it did not belong to either of them. *Id.*, pp. 253-254. Johnson told Williams the gun belonged to Johnson's cousin. *Id.* On cross examination, Williams said he wrote to Defendant to tell him about the conversation with Johnson, and told him to give a copy to his lawyer. *Id.*, pp. 258-260. Williams said when he talked to the agent he did not tell him about this. He just told him that Johnson was not going to change his statement from that which he told the grand jury. *Id.*, p. 260. Williams told the agent he did not want to testify. *Id.*, p. 261.

Marcus Palmar testified that he knew Defendant and Freddie Turner, and was riding with Turner on the night of the car incident. *Id.*, p. 263. He said that around 2:00 a.m. they went to Defendant's apartment, and Turner tried to rent his car in exchange for drugs. *Id.*, p. 264. He testified that Defendant did not have drugs, but gave the men

money which they used to buy crack cocaine from someone else in the apartment.  *Id.*, pp. 264-265.  Palmar said he did not see a gun that night, and Turner handed over his keys willingly.  *Id.*, pp. 265-266.  He said Defendant was supposed to bring the car back sooner and Turner had to go to work.  *Id.*, p. 266.[4]

Palmar said that Defendant returned about 30 minutes after Turner left, so Palmar told Defendant where Turner lived and Defendant left to take the car back to him.  *Id.*  He said Defendant returned 15 minutes later and said the police got behind him, that Turner had complained to the police that Defendant had stolen the car because it belonged to Turner's wife.  *Id.*

Palmar said he had been friends with Defendant and Turner, and he used to go to that apartment a lot to get crack cocaine.  *Id.*, pp. 268-269.  He said he bought crack cocaine from McCray, Robinson, and Defendant, though at first he denied buying drugs from Defendant.  *Id.*, pp. 269-271.

The defense rested.  *Id.*, p. 274.  In closing argument, the prosecutor talked about Johnson changing his story, and suggested that the truth came out at trial.  *Id.*, pp. 294-295.  He talked about Smith and Palmar wanting to help Defendant by being witnesses for him.  *Id.*, p. 295.  It was pointed out that Palmar admitted that Defendant was selling drugs with his friends from that location, which shows a conspiracy.  *Id.*, pp. 295-296.  He asked the jurors to determine for themselves if it was Defendant in the video with the stocking cap, and "[i]f you think that that's a beard, some type of full beard, well, I suggest to you it's not.  I suggest to you it's shadowing from the video.  We

---

[4] Turner, who had been smoking crack through the night, was to be at work driving an 18 wheeler.  *Id.*, pp. 267-268.

know it's a poor quality of video, it was dark. What you do see is some type of facial hair, more on the chin and face, as was testified to." *Id.*, p. 296.

In his closing argument, defense counsel talked about the quality of the video, and suggested that it was for the jury to determine whether it was Defendant or – counsel suggested – someone else. *Id.*, pp. 300-301. He talked about Johnson, that he "has got to present some problems" for the jury, because his story was "180 degrees different" than his grand jury testimony. *Id.*, p. 303. "He told you that he lied to the federal grand jury; and, as a consequence, Mr. Gospidon was indicted for this offense. Now, he is coming in now and telling you that he is telling you the truth in an attempt to get Mr. Gospidon convicted of this offense." *Id.* Counsel suggested "that the person upstairs [in the video] that you see with the beard and the bandana is not" Defendant, and the jury could look and decide for itself. *Id.*, p. 307, 309.

In final closing argument, the Government noted that if there was another unknown person in the video (as the defense suggested) it would suggest Moody was there with two men at once, which was illogical. *Id.*, p. 311.

The jury returned guilty verdicts on all counts. *Id.*, pp. 341-342. Before sentencing, Defendant filed a pro se motion for judgment of acquittal, arguing that a search warrant was not obtained prior to the search of August 19, 2005, as nothing was filed until August 30, 2005. Doc. 53, pp. 5-6. The motion was denied by order of September 7, 2006. Doc. 57. Reconsideration was denied by order of October 24, 2006. Doc. 67.

Sentencing was held on October 12, 2006. Doc. 90 (transcript). The statutory sentencing range was ten years to life, as enhanced, based on the jury's finding that the

offense involved five grams or more of crack cocaine . *Id.*, p. 6. A more specific determination of quantity would not change the guidelines range of 360 months to life as a career criminal, so the court did not make such a finding. *Id.*, pp. 6-7, 34.

Counsel argued that, notwithstanding the verdict, Defendant still insisted on his innocence, that there was no conspiracy, and there were no named codefendants. *Id.*, p. 7. Most of the crack seized that day was in McCray's pockets, and McCray received a state sentence of only three years. *Id.*, pp. 7-8. He argued that Johnson not only committed perjury, either in the grand jury or at trial, but admitted at trial he had lied earlier, "and we would submit that he was lying on both occasions." *Id.*, p. 8. Defendant pointed out that in the each of the controlled buys, less than a gram was sold, and argued that he was not the person in the video. *Id.*

Defendant was given the opportunity to address the court. He said he did not sell drugs out of that apartment, and the gun did not belong to him. *Id.*, p. 12. He said they charged him with conspiracy, which requires an agreement between two or more people, but he was the only one named in the indictment. *Id.* He said the controlled buys were for nowhere near five grams, and police found nothing on him in the search. *Id.*, pp. 12-13, 16.

Defendant argued to the court that the arrest affidavit showed the apartment door was breached at 10:00 a.m., that the warrant was executed at 10:05 a.m., but he was already in jail at that time. *Id.*, pp. 15-17. He said the search warrant was for him but the inventory was in reference to a person named Shelton Pruitt. *Id.*, p. 16. He said the house was staged with evidence. *Id.* He said that the warrant reflected that it had been served on Moody, but she never received it. *Id.* He argued that Corder testified that he

got the search warrant that morning, but the name on the affidavit, sworn before Judge Parsons, was Matthew Rowan. *Id.*, p. 17.

Defendant said someone from his family went to the clerk's office to learn about filing procedures, and provided (as an example of such procedures) an order appointing counsel for a defendant, which was both signed and filed on March 8, 2006. *Id.*, pp. 17-18. Defendant argued they did not have the warrant in this case when they kicked the door in on August 19, 2005, as the warrant was not filed until August 30, 2005. *Id.* Defendant argued that if Corder or Rowan went to the judge and got the search warrant it would have been filed the exact same day, not 11 days later; and pointed out there was no filing date for the search warrant itself. *Id.*, p. 18. Defendant said that while a no-knock warrant was requested, the judge did not specify it was a no-knock warrant, and he again pointed out that the warrant was not filed and the inventory was in reference to Shelton Pruitt. *Id.*, pp. 18-19. He repeated, "the drugs were not mine. The gun was not mine. It's plain, it's simple." *Id.*, p. 19. He claimed it was "a malicious prosecution. Documents have been fabricated. Lies [have] been told. They built this case when they put me in jail." *Id.*

The court pointed out that other conspirators did not have to be named in the indictment, and here the sentence would be the same even without the conspiracy count. *Id.*, p. 32. The fact that the charges originated in state court, said the court, was not unusual. *Id.*, pp. 32-33. Regarding the reference to Shelton Pruitt, the court noted that that could have been the last inventory prepared on the computer, and if they failed to change the name, that was just a mistake. *Id.*, p. 33. The court observed that the file stamp of August 30th was not surprising either, as things in this court are signed and

processed and do not necessarily make it to the clerk for a week or more.  *Id.*, pp. 33-
34.

> There is nothing in what Mr. Gospidon has presented to lead me to
> believe that there was not a search warrant issued prior to the time.  There
> is a search warrant with Judge Parsons' signature, and it has a date on it.
> There's absolutely no basis to believe that there wasn't a search warrant
> duly entered, issued prior to the time of this search.

*Id.*, p. 34.

The court imposed a sentence of 30 years (360 months) on counts one, two,
three, and five, to be served concurrently, plus 7 years (84 months) on count four, to be
served consecutively, for a total of 37 years (444 months).  *Id.*, p. 35, 37; doc. 63
(judgment).

Defendant appealed.  The Eleventh Circuit rejected his argument that, as a result
of the Apprendi[5] case, the names of coconspirators had to be set forth in the indictment.
Doc. 98, opinion p. 2.[6]  Other challenges to the indictment were rejected as improperly
made for the first time on appeal.  *Id.*, pp. 2-3.  The court found no error in denial of the
motion for judgment of acquittal as to conspiracy, as "[t]he evidence in this record
clearly supported the jury's finding that Gospidon conspired with others to sell crack."
*Id.*, pp. 3-4.  The court declined to address Defendant's claim of ineffective assistance of
counsel, for failing to request a jury instruction explaining the difference between a
conspiracy and a buy-sell transaction, as ineffectiveness is generally not considered on
direct appeal.  *Id.*, pp. 4-5.  This § 2255 motion followed.

---

[5] Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435
(2000).

[6] The first page is the mandate of June 12, 2007, with the opinion attached, so p.
2 of the opinion is p. 3 of the document as scanned in ECF.

**§ 2255 Review**

Postconviction review pursuant to 28 U.S.C. § 2255 is limited:

Courts have long and consistently affirmed that a collateral challenge, such as a § 2255 motion, may not be a surrogate for a direct appeal. Because collateral review is not a substitute for a direct appeal, the general rules have developed that: (1) a defendant must assert all available claims on direct appeal, and (2) "[r]elief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.' "

Lynn v. United States, 365 F.3d 1225, 1232 (11th Cir.), *cert. denied*, 543 U.S. 891

(2004) (citations and footnotes omitted).

Errors raised and adjudicated on direct appeal cannot be considered pursuant to

a § 2255 motion.  United States v. Nyhuis, 211 F.3d 1340 , 1343 (11th Cir. 2000)

(citation omitted).  An issue not raised on appeal, on the other hand, is procedurally

barred and will not be reviewed absent a showing of cause and prejudice.  *Id.*, at 1344

(citations and footnote omitted).  "Ineffective assistance of counsel may satisfy the

cause exception to a procedural bar," however, and ineffective assistance of counsel

may be raised in a § 2255 motion whether or not it could have been raised on direct

appeal.  211 F.3d at 1344; Massaro v. United States, 538 U.S. 500, 504, 123 S.Ct.

1690, 1693-1694, 155 L.Ed. 2d 714 (2003).  *See also* Edwards v. Carpenter, 529 U.S.

446, 451, 120 S.Ct. 1587, 1591, 146 L.Ed.2d 518 (2000) ("ineffective assistance

adequate to establish cause for the procedural default of some *other* constitutional claim

is *itself* an independent constitutional claim.") (emphasis by the Court).[7]

---

[7] While the Government summarizes all of Defendant's claims as ineffective assistance of counsel claims, it asserts procedural default as to some of the underlying claims errors of counsel.  Doc. 202, pp. 1-2, 5-6, 8.  The Government also addresses the merits, and the court reviews all claims in the context of the two part test for

To prevail on a claim of ineffective assistance of counsel, Defendant must demonstrate that counsel's performance was deficient, *i.e.*, that his performance fell below an objective standard of reasonableness, and prejudice as a result of that deficient performance. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 2064-65, 80 L.Ed.2d 674 (1984). The court need not address both deficient performance and prejudice where a defendant makes an insufficient showing as to one. *Id.* at 697, 104 S.Ct. at 2069. It is presumed that counsel's performance was objectively reasonable, so for Defendant to show it was unreasonable, he "must establish that no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (*en banc*), *cert. denied,* 531 U.S. 1204 (2001) (footnote and citation omitted).

For prejudice, Defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. For alleged ineffectiveness at sentencing, Defendant must show a reasonable probability that, absent the errors, the court would have sentenced him differently. 466 U.S. at 695, 104 S.Ct. at 2069.

Defendant "bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a *Strickland* claim, and both prongs must be proved to prevail." Johnson v. Alabama, 256 F.3d 1156, 1176 (11th Cir. 2001), *cert. denied*, 535 U.S. 926 (2002). The cases which prevail under Strickland "are few and far between." *Id.* (citation omitted).

---

determining ineffectiveness of counsel (set forth ahead).

**Ground One**

Defendant asserts ineffective assistance of counsel for failing to challenge the search and seizure of his residence. § 2255 memo, pp. 3-9 (doc. 103, pp. 8-14 in ECF) (electronic case filing).[8] He essentially repeats the arguments he made to this court at trial and sentencing, that the search warrant could not have issued before the search of August 19, 2005, because it was not filed on or after that date, and not file stamped ("Filed for Record") until August 30, 2005. *Id.*, pp. 3-4 (pp. 8-9), referencing § 2255 Exs. A and B.

Provided as Ex. A is a copy of the docket in state court case number 05000528CFMC, for sale of cocaine within 1000 feet of public housing, possession of a firearm by a convicted felon, felony possession of a firearm, and two counts of possession of drug paraphernalia. Ex. A (doc. 103-2, pp. 7-10). The docket reflects Defendant's arrest and first appearance on August 19, 2005, but not the filing of a search warrant on that date or thereafter. Defendant's Ex. B includes copies of the search warrant application and affidavit, written and signed by Rowan, sworn and witnessed with what appears to be a different signature on August 19, 2005, but stamped "filed for record" on August 30, 2005. § 2255 Ex. B, pp. 1-9 (doc. 103-2, pp. 12-20). Attached to the application is a description of the Parkview Gardens Housing

---

[8] The motion and memorandum were scanned as doc. 103, a 30 page document in the court's electronic case filing docket (ECF). The affidavit and exhibits were scanned as doc. 103-2, a 35 page document in ECF. References to Defendant's arguments in doc. 103 are to § 2255 motion or § 2255 memo, followed by the page number as marked by Defendant, followed in parenthesis with the page numbers of the document as scanned in ECF. References to the affidavit in doc. 103-2 are to § 2255 affidavit, or to § 2255 Ex, followed by the letter assigned by Defendant, followed in parenthesis with the page numbers of the exhibit (including the cover page identifying the exhibit) as scanned in ECF.

Project, a diagram, and a description of the items to be searched for and seized. *Id.*,

pp. 10-11 (pp. 21-24).[9]  The search warrant references Exhibits A and B, and bears a

signature dated August 19, 2005, with "Honorable, Judge" typed below the signature.

*Id.*, p. 12 (p. 23).  At the top is a date stamp that appears to have been affixed by the

Gadsden County Sheriff's Office ("GCSO Investigations") dated June 23, 2009, at 14:17

hours (2:17 p.m.), page 81 (apparently the page number assigned in the investigations

file).  *Id.*

        The search warrant return and inventory is styled "in Ref: Shelton Pruitt," but is

clearly the return from this case.  *Id.*, p. 13 (p. 25).  It reflects that the search warrant

was received, served upon Tasha Moody, and executed, all occurring on Friday, August

19, 2005.  *Id.*  The return was signed by Rowan.  *Id.*  It is attached to the Search

Warrant that has the style "In Ref: Gangsta Gospidon."  *Id.*, p. 10 (p. 23).

        Defendant provides a copy of a letter to the state court clerk dated July 11, 2007,

asking for a copy of the search warrant and docket in 05000528CFMC.  § 2255 Ex. C

(doc. 103-2, pp. 27-26).  Defendant's Ex. D, labeled as "docket sheet from [Gadsden]

County Clerk[']s Office showing that no warrant or application was filed by the clerk on

August 19, 2005," is a docket of state court case number 05000597CFMA, *another*

criminal case against Defendant.  § 2255 Ex. D (doc. 103-2, pp. 28-33).  In that case,

Defendant was charged with fleeing or attempting to elude an officer and driving while

license suspended or revoked.  *Id.*  It has nothing to do with the search warrant in this

--------------------------------------------------------------------------------

        [9] Exs. A and B to the warrant application are pp. 10 and 11, and pp. 22 and 24 in
ECF.  The diagram is not numbered but appears as part of the exhibit.  Doc. 103-2, p.
22 in ECF.  It bears a notation that it was sent by fax to Corder on March 6 (no year
specified), and may or may not have been part of the application itself.

case, and it is not surprising that the search warrant return was not docketed in that case.

Defendant claims that the warrant was not issued by a magistrate or judge before the law enforcement officers conducted the search, and "thus was based upon false and unreliable tactics and forged signatures that were signed by the arresting officer Matthew E. Rowan and pretended to be executed by a judicial officer." § 2255 memo, p. 5 (doc. 103, p. 10 in ECF). Defendant asserts that at sentencing, he preserved this claim for appellate review, yet appellate counsel "omitted a dead-bang winner on appeal" by failing to raise it. § 2255 memo, p. 7 (doc. 103, p. 12), referencing the sentencing transcript (doc. 90). He essentially reiterates the claims in his traverse. Doc. 108, pp. 6-13.

In his affidavit, Defendant asserts:

> Special Agent Matthew Rowan lied about obtaining a search warrant from Judge Parsons, although there was [an] application for a search warrant and probable cause affidavit that on its face looked to be valid. Thus, these documents [were] created by Matthew Rowan, because the petitioner's docket sheet never stated that prior or before entering the petitioner's residence the clerk of Court's correctly docketed the application and the search warrant. What makes matter[s] more worse [sic] is the fact that throughout the entire trial of the petitioner Matthew Rowan testified that on the morning of the search warrant he personally entered Judge Parson[']s chambers early that morning and witnessed Judge Parson issue[] that said warrant. Had Judge Parson personally issued that warrant it would clearly show up on the petitioner's docket sheet.

§ 2255 Affidavit, p. 3 (doc. 103-2, p. 4).

Defendant has come forward with no evidence beyond what was already argued and rejected at trial and sentencing. Defendant is convinced that the lack of an earlier clerk's file stamp on the document itself, and lack of a docket entry, proves a warrant

was not issued by the court and so must have been forged or created after the fact by law enforcement.  It does not.  It is not known how search warrants might be filed and retained by the clerk of court in a Florida case, but the only pleadings that must be filed are those arising after the initial information or indictment, and formal charges may be filed up to 30 days from the date of arrest.  Fla. R. Crim. P. 3.030, 3.134.

I issue many search warrants in this court, and these are almost always issued before an indictment.  The point of a search is to gather evidence to see if an indictment is warranted.  The indictment opens the criminal case.  If there had been an earlier search warrant, the search warrant will eventually be filed in the criminal case, but at some time after the search has been executed.  Before indictment, search warrants are usually docketed by the clerk in preliminary cases, either under a miscellaneous number or (more often) a magistrate judge number.  The search warrant is often promptly docketed under these preliminary case numbers shortly after it has issued, but sometimes a search warrant is issued on a weekend and is not docketed in a preliminary case until after the search has been conducted.  The failure to promptly file the search warrant into a preliminary case does not alter the authority of the search warrant.

In summary, this claim is unsupported speculation.  The lack of a docket entry in Defendant's state criminal case showing the docketing of the search warrant prior to the search is not evidence that there no search warrant issued before the search.  The search warrant itself is regular on its face and was signed before the search took place. Therefore, there is no showing of attorney error or prejudice in failing to seek suppression of evidence on these grounds.

**Ground Two**

Defendant claims that he is actually innocent of counts one, two and three as charged in the indictment, and his counsel was ineffective for failing to hold the Government to its burden of proof. § 2255 motion, p. 3 and § 2255 memo, pp. 9-16 (doc. 103, pp. 3, 14-21). Defendant is apparently asserting actual innocence to excuse any procedural default, and not as a separate claim for relief. *See Id.*, pp. 10-11 (pp. 15-16). This does not state an independent claim.[10] As explained above, however, the claim is not defaulted as an ineffective assistance of counsel claim, but it is unsupported.

Specifically as to the conspiracy (count one), Defendant contends that there was only evidence that he sold drugs, and a mere buyer-seller transaction does not demonstrate a conspiracy. *Id.*, pp. 10-12 (pp. 15-17). Defendant challenged the sufficiency of evidence to support a conspiracy by filing a pro se motion for judgment of acquittal, and sought reconsideration when that motion was denied. Docs. 53 and 60. Though he did not specifically assert the buyer-seller theory, it would not have made a difference. The court found "[t]here was abundant testimony of cooperation between Mr. Gospidon and others, including some who sold crack from this same apartment. This, together with the evidence underlying the other counts, was sufficient to support

---

[10] A claim of actual innocence standing alone, without an independent constitutional violation, does not warrant postconviction relief. House v. Bell, 547 U.S. 518, 537-539, 126 S.Ct. 2064, 2077-78, 165 L.Ed.2d 1 (2006) (explaining that actual innocence is a gateway for review of defaulted constitutional claims; it is not to be confused with the standard for sufficiency of evidence, as an actual innocence claim involved evidence the jury did not have before it); Jordan v. Secy Dept of Corrections, 485 F.3d 1351, 1353-54 (11th Cir.), *cert. denied*, 128 S.Ct. 450 (2007) (bare claim of actual innocence did not establish a basis for relief; it must be asserted as a gateway to review of a constitutional claim).

the jury's conspiracy verdict, on count one."  Doc. 57, p. 3 (denying pro se motion for

judgment of acquittal).  The court found the evidence "was sufficient for a reasonable

trier of fact to conclude that defendant conspired with any of the other persons taken

into custody during the execution of the search warrant preceding defendant's arrest."

Doc. 67, pp. 1-2 (order denying pro se motion for reconsideration).

Likewise, the Eleventh Circuit found:

In this case, the evidence presented at trial indicated that Gospidon began
using his girlfriend's apartment as a drug sales center.  The evidence in
this record clearly supported the jury's finding that Gospidon conspired
with others to sell crack.

Doc. 98, p 4 (p. 5).

Defendant has not shown what counsel should have done to alter these rulings.

Thus, Defendant has not shown error of counsel or prejudice to the outcome for failing

to make a persuasive buyer-seller argument.

As to the substantive counts (two and three), for distribution and possession with

intent to distribute crack on August 18 and 19, 2005 (the two controlled buys),

Defendant claims that Bullock did not say Defendant sold him drugs, but that a man *with

a beard* sold him drugs.  *Id.*, pp. 12-13 (pp. 18-19), referencing the transcript of the

proceeding resulting in a mistrial (doc. 86).  He also quotes the court from that

proceeding, noting that the person in the video looked "a bit like" Defendant "but it's not

a great photograph.  The person in the video has a beard.  I don't know what the

booking photo shows in this case, but I assume there was one, and so he either had a

beard or he didn't."  *Id.*, p. 13 (p. 18); doc. 86, pp. 134-135.  Defendant now submits a

photocopy of his booking photo, and claims that if counsel had introduced this photo,

showing he did not have a beard, there is a reasonable probability he would have been acquitted.  § 2255 memo p. 13 (p. 18); § 2255 Ex. K (doc. 103-2, pp. 34-35).

This exhibit, a photocopy of a photograph, is itself of poor quality but it shows that Defendant had a thin mustache running into goatee, facial hair which reasonably could be considered to be a beard.  The jury saw Defendant at trial, watched the video, and could determine the credibility of witnesses who testified to the identity of who was in the video.  Moreover, there was argument at trial over whether the person in the video had a beard, and whether the person in the video (who weighed less than Defendant did at trial) actually was Defendant or someone else.  The booking photograph was unquestionably of Defendant, taken shortly after the video.  Providing that photograph to the jury might well have shown him to look even more like the person in the video than he did at trial since he had a goatee at that time.  The arguments as to identity were made and rejected by the jury, who had viewed the video and viewed Defendant in person through trial.  Defendant has not shown error of counsel or prejudice to the outcome in failing to introduce his booking photo, § 2255 Ex. K, to the jury.


**Ground Three**

Defendant asserts ineffective assistance of counsel as the prosecution knowingly relied on perjured testimony of Ronnie Johnson and Matthew Rowan to obtain an indictment and conviction.  § 2255 motion, p. 4, § 2255 memo pp.16-23 (pp. 21-28 in ECF).

To obtain a reversal on the grounds that the government relied on perjured testimony, the following must be shown: (1) the contested statements were actually false, (2) the statements were material, and (3) the prosecution knew that they were false.

United States v. Bailey, 123 F.3d 1381, 1395 (11th Cir. 1997) (citation omitted).

Ventura v. Attorney General, Fla. 419 F.3d 1269, 1276-77 (11th Cir. 2005) (to prevail, petitioner had to establish that the prosecutor knowingly introduced false testimony, or failed to correct what was later learned to be false, and the falsehood was material) (citations omitted).

In Bailey, the alleged perjury was of a Government agent as to one tape recording of a conversation out of several tape recordings. The agent testified that the tapes were the only conversations he recorded, but another conversation had been recorded and (he testified) he forgot that the other conversation had been recorded. 123 F.3d at 1394. The court noted that the defendant "had ample opportunity to exploit" any inconsistencies in the agent's testimony and attack his credibility. If the jury decided the testimony was false it would have disregarded it. If true, there was no falsehood to disregard. *Id.*, at 1396 (citations omitted). For reversal, perjured testimony must remain undisclosed during trial, the falsity must have been known or discovered by the prosecutor, and the failure to disclose must affect the fairness of the proceeding. *Id.*, at 1396-97 (citations omitted).

Defendant claims that Ronnie Johnson testified falsely *before the grand jury*, and points to discrepancies in Johnson's testimony and his admission at trial that he was not being truthful before. § 2255 memo, pp. 17-21 (pp. 22-26 in ECF). This does not show knowing use of perjured testimony *at trial* by the Government. Johnson changed his story and told the agent of his change in testimony right before trial started, and this was

revealed at trial. The agent and the prosecutor believed Johnson's trial testimony was true, rather than his grand jury testimony, and that Johnson was afraid to tell the truth before.

Defendant claims in his traverse that, as the perjury had already occurred before the grand jury, the indictment had to be dismissed or the grand jury had to be informed of it. Doc. 108, p. 18. But the Government did not know Johnson's testimony would change until the day before trial, and the alleged perjury – that Johnson never saw Defendant with the Ruger nine millimeter – was *not* believed or relied upon by the grand jury, as the Ruger nine millimeter is the basis for the grand jury's indictment in counts four and five.

As to Matthew Rowan, Defendant provides excerpts from Rowan's testimony regarding whether it was a no-knock warrant, and saying that he obtained the warrant from Judge Parsons and had discussed the issuance of a no-knock warrant with Judge Parsons. § 2255 memo, pp. 21-22 (pp. 26-27 in ECF). Defendant provides his affidavit (quoted *supra*) with regard to Rowan lying about obtaining the warrant because, had a warrant issued, argues Defendant, it would have been filed on the docket. But the lack of a docket entry does not show Rowan's testimony to be false or show the Government knew it to be false, as discussed above.

**Ground Four**

Defendant asserts ineffectiveness for counsel's failure to object to amendment of the indictment. § 2255 motion, p. 4. He alleges that the indictment charged five grams or more of cocaine base, but at sentencing it was determined that he was guilty of a much greater quantity, thus constructively amending the indictment. § 2255 memo, pp.

23-24 (pp. 28-29 in ECF). The Government responds that there was no error in the calculation or determination of drug quantity. Doc. 105, pp. 24-25.

Even if a finding at sentencing of a greater drug quantity than charged in the indictment and found by the jury could justify relief, the claim here is unfounded. The court expressly made no drug weight finding:

> I *don't make a finding with respect to the drug weight*, except that I accept the jury's verdict that the amounts involved in those counts was more than 5 grams as the jury found. Beyond that, the drug weight doesn't make a difference to the sentence; and, therefore, *I don't make a specific finding as to drug weight.*"

Doc. 90, p. 34 (emphasis added).

**Recommendation**

It is therefore respectfully **RECOMMENDED** that the amended § 2255 motion filed by Defendant Gospidon, doc. 103, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on August 4, 2009.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case Nos. 4:06cr21-RH and 4:08cv211-RH/WCS